## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BENJAMIN M. AUSLANDER                    No.  2:22-cv-01425-HB

           Plaintiff

      v.

TREDYFFRIN/EASTTOWN SCHOOL
DISTRICT, ARTHUR J. MCDONNELL, in
his individual and official capacities.
                Defendants

---

## TRIAL MEMORANDUM OF PLAINTIFF, BENJAMIN M. AUSLANDER

### INTRODUCTION AND BACKGROUND

The First Amendment anchors "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The teaching of critical race theory[1] in our nation's schools has engendered a contentious national debate. Gabriella Borter, Explainer: *What 'critical race theory' means and why it's igniting debate*, reuters.com (Sept. 22, 2021); Joshua Jamerson, *Critical Race Theory: What*

---

[1] Two leading proponents of CRT, Richard Delgado and Jean Stefanic, state "critical race theory questions the very foundations of the liberal order, legal reasoning, enlightenment rationalism, and neutral principals of constitutional law." RICHARD DELGADO & JEAN STEFANIC, CRITICAL RACE THEORY: AN INTRODUCTION, 3, (NEW YORK UNIVERSITY PRESS eds., THIRD EDITION, 2017) CRT theorist believe "racism is ordinary, not aberrational – "normal science," the usual way society does business, the common, everyday experience of most people of color in this county." *Id.*, 8. "Critical race theorists (or "crits" as they are sometimes called) hold that color blindness will allow us to redress only extremely egregious racial harms, one that everyone would notice and condemn [and] only aggressive, color-conscious efforts to change the way things are will do much to ameliorate misery." *Id.*, at 27. Therefore, they advocate against those in the judiciary that exercise color blindness when applying the law. *Id.*, 28.  CRT advocates are also "suspicious of another liberal mainstay, namely, rights." *Id.*

*it Means for America and Why It Has Sparked Debate*, Wall Street Journal, June 17, 2021. This case is about plaintiff's efforts to express his views on CRT and to obtain copies of CRT materials purchased with taxpayer money to use and distribute to further a robust and free debate on the topic.

Th Defendants are Tredyffrin/Easttown School District (the "School District") and its business manager, Arthur J. McDonnell ("McDonnell"). Plaintiff is Benjamin M. Auslander, a parent of a student in the School District and a taxpayer to the School District.

Since 2018, the School District has maintained a contract with a third-party vendor, Pacific Educational Group, for the preparation of materials related to the School District's CRT program. www.tesd.net/Page/16577. Joint Stipulation of Facts ("Stip"), ¶ 5, 10. The School District uses taxpayer money to pay for PEG's services. *Id.*, ¶ 9. The School District identifies PEG work on the School District's website. www.tesd.net/Page/16577. *Id.*, 10. The School District has identified six components of PEG work for the School District:

- Beyond Diversity
- District Executive Equity Leadership Team (DELT)
- Leadership for Racial Equity Team (LEADS)
- Site Equity Leadership Teams (E-Teams)
- PEG Affiliate Practitioners
- Students Organized for Anti-Racism (SOAR)

*Id.*, Exhibit 1.

The specifics of these components are explained in the document *TESD and Pacific Educational Group, An Update on Racial Equity Work Provided by the*

*Education Committee, April 2020. Id.*, ¶ 11, Exhibit 3. As stated in that document, "DELT is focused on building executive capacity and accountability for leading and implementing district equity transformation." Ex. 2, p. 5. "LEADS is focused on deepening the will, skill, knowledge and capacity of administrators to lead, oversee, and manage the dynamic process of system-wide racial equity transformation." *Id.*, p. 6. The participants in LEADS are superintendents, directors, principals, and assistant principals. *Id.* "E-Teams examine their school's policies, practices, programs, structures, climate and culture to identify barriers to equity and excellence and lead systemic change efforts that result in high levels of achievement for all students." *Id.*, p. 7. It explains that the PEG Affiliate Program "is designed to enable participants to serve as Courageous Conversations About Race Practitioners, Facilitators, and Coaches within their own school districts." *Id.*, p. 8. Finally, the School District explains that SOAR is directed towards students in the School District and "is designed to empower young people of all races to become catalysts for change through leadership and racial equity." *Id.*, p. 9. "Students receive training in Beyond Diversity that is similar to what is provided to adults." *Id.* Teachers, counselors and administrators "recommend" students that need this training. *Id.* Additionally, PEG reviews the School District's ELA and social studies curriculum "through the lens of equity and social justice." *Id.*, p. 10.

On January 19, 2022, Auslander made a request to the School District under Right to Know Law, for "all records, lesson plans, and materials prepared by PEG to [the School District's] teachers." Stip., ¶ 27, Exhibit 18. On January 26, 2022,

McDonnell, on behalf of the School District, issued a written denial of Auslander's right to know request. *Id.*, ¶ 28, Exhibit 19. The reason McDonnell gave for denying Auslander's right to know request was:

> "The request for copies of the records is denied because they are protected by copyright, however, you may contact my office to schedule a time to inspect the responsive records. Please note that due to copyright protections, you will not be permitted to copy or photograph the records."

Exhibit 19.

The School District does not claim to hold a copyright in any materials produced or created by PEG. Stip., ¶ 30.  But the School District does claim that PEG holds a copyright. *Id.*

Pursuant to the School District's offer to inspect the responsive records, on February 7, 2022, at 1:30 p.m., Mr. Auslander went to the School District's offices located at 940 West Valley Road, Suite 1700, Wayne, PA 19087, to inspect the records. *Id.*, ¶ 31.  The School District made available to Auslander 166 pages of documents prepared for the School District by PEG (the "PEG Materials"). *Id.*, ¶¶ 12, 31, 35. McDonnell was present at the inspection, as was Mary Minicozzi, an employee of the School District. *Id.*, ¶ 4. During his review of the PEG Materials, Auslander made verbal recordings on his smartphone.  *Id.*, ¶ 36. Auslander made a total of 11 voice recordings. *See* Exhibits 20-1 through 20-11. McDonnell told Auslander that he could not make voice recordings. Stip., ¶ 37, Exhibits 20-1 through 20-11. McDonnell said that Auslander's voice memorandum were considered transcribing and "that is a violation of the copyright law."  Ex. 20-8, 20-9.  McDonnell told Auslander "you

recording what's in writing there into your phone is a violation of the copyright law." Ex. 20-9. McDonnell then said, "what is going to happen is when you leave I am going to inform PEG and inform their (sic) attorney. . . and I am advising you it is a violation of the copyright law." *Id.* McDonnell told Auslander that "if [he] did one more voice recording, he would end the meeting" after which McDonnell collected the materials and asked Auslander to leave. Ex. 20-11. At 2:00 p.m. McDonnell ended Auslander's review of the documents. Stip., ¶ 40. McDonnell made those comments after discussions with his counsel, Wilser Pearlstein, LLP. *Id.*, ¶ 41. McDonnell had authority to make those comments on behalf of the School District. *Id.*, ¶ 42. McDonnell had final authority to terminate the inspection and did decide to terminate the inspection because Auslander was making voice recordings while inspecting the PEG Materials. *Id.*, ¶¶ 42-43.

Auslander's January 19, 2022 RTKR is one of numerous RTKR the School District has received concerning the PEG Materials. Since at least the summer of 2021, the School District has received numerous requests under Pennsylvania's Right to Know Law, 65 P.S. § 67.101, et. seq. (the "Right to Know Law") for materials that PEG prepared for the School District. *Id.*, ¶¶ 14, 19, 27, Exhibits 21-24. Wendy Towle is the School District's Director of Curriculum, Instruction, Staff Development and Planning. Stip., ¶ 45. On July 14, 2021, Towle sent an email to Luis Versalle of Pacific Educational Group that stated:

> "Hi, Luis – We have received another Right to Know Request regarding our work with PEG. I was asked to reach out to you and share that the training materials from PEG were once again part of that request and that I should also share the following with you from our solicitor –

> Also, we should notify PEG that its materials have been requested through a Right to Know Request so that it can (again) advise that it objects to its materials being made available to a requester under the Right to Know Law. This is also important because when the appeal is filed, PEG will need to join in the appeal so that it can submit its legal and factual arguments against public disclosure.
>
> Please provide me with your request to this request as soon as you are able. We have a timeline for response (sic) that we must follows."

*See* Exhibit 21.

Towle apparently did not receive a response to her July 14, 2021 email, so the next day, on July 15, 2021, Towle sent an email to Chris Lam of Pacific Educational Group stating, in relevant part:

> "What would be helpful right now is a statement regarding your services on the proprietary nature of PEG's training materials.

Exhibit 22.

A month later, Towle again emailed Lam of PEG asking:

> "Hi, Chris – I am wondering if you have anything related to my [July 15, 2021] request below – we have to reply to the RTK by end of day tomorrow."

Exhibit 23.

ARGUMENT

## I.   THE FIRST AMENDMENT PROTECTS THE RIGHT TO CRITICIZE GOVERNMENT CONDUCT AND TO GATHER INFORMATION TO FACILITATE THAT CRITICISM THROUGH VIDEO AND AUDIO RECORDINGS.

A pillar of the First Amendment is the protection of public debate on issues of public concern and of the officials in a position to address those issues and concerns. *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("There is, first, a strong interest in debate

on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues."). In *Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 604 (1982), the Supreme Court recognized the paramount importance of a robust debate on the conduct of government officials explaining, "a major purpose of the [First] Amendment was to protect the free discussion of governmental affairs" and "to ensure that this constitutionally protected 'discussion of government affairs' is an informed one." It follows that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt,* 383 U.S. at 85. And "[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Id.* Therefore, the Supreme Court recognizes "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, (1964). Accordingly, public discourse on public issues is afforded "the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Synder v. Phelps,* 562 U.S. 443, 452 (2011); *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) (recognizing the "paramount public interest in a free flow of information to the people concerning public officials, their servants.")

For that criticism to be effective, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–76 (1980). The First

Amendment incorporates a general right, rooted in common law predating the Constitution, to gather information about official conduct including a "right of access to information about [] officials' public activities." *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017).[2]  Thus, there is a First Amendment right, "to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).

The Third Circuit recognizes that the right to gather information includes the right to record government conduct using video or audio recordings. In *Fields*, the Third Circuit articulated the important role audio and video recording play in facilitating the uninhibited robust and wide-open exchange of information:

> "To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts. Hence to record is to see and hear more accurately. Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media."

*Fields,* 862 F.3d at 359.

In *Fields*, that meant the public had the right to video record police activity. In *U.S. v. Criden*, that meant news organizations could make copies of exhibits admitted into evidence in a criminal trial, including video and audio tapes. 648 F.2d 814 (3d. Cir. 1981). In *Robinson v. Fetterman*, 378 F.Supp.2d 534, 541 (E.D. Pa. 2005), it meant that the First Amendment protected video recording of police activity

---

[2] Through its Right to Know Law, 65 P.S. § 67.101, et. seq., under which Auslander made his request, Pennsylvania also recognizes the importance of public criticism of government officials and the Pennsylvania Supreme Court has declared that the law is "designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *McKelvey v. Pennsylvania Dep't of Health*, 255 A.3d 385, 400 (Pa. 2021).

because "videotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence, as it did in this case." And in *Philadelphia Bail Fund v. Arraignment Court Magistrate Judges*, 440 F.Supp.3d 415 (E.D. Pa. 2020) it meant that the First Amendment provided a right to audio record bail proceedings in Philadelphia Municipal Court even though the Pennsylvania Rules of Criminal Procedure and the Pennsylvania Rules of Judicial Administration prohibited such audio recordings. The common thread of these cases is that First Amendment protects the public's right to witness the conduct of government officials *and* the right to record it in a manner that will facilitate wide dissemination and discussion among the public. The School District and McDonnell's policies and conduct are inconsistent with this jurisprudence.

To be clear, the School District denied Auslander both his expressive conduct and his right of access. The School District denied Auslander's right to engage in expressive conduct when it stopped Auslander from recording on his phone the thoughts he expressed about the documents. He was not taking photographs of the documents, nor did he attempt to. There should be no question that the First Amendment clearly protects Auslander's right to - at a minimum- record his own thoughts and the School District violated his First Amendment rights by claiming his expressive activity violated the "Copyright Act" and by terminating his review of the documents if he continued to engage in expressive conduct. Indeed, by changing one variable, the School District's argument becomes patently absurd. Suppose Auslander was a journalist instead of an average citizen.  This Court would hardly

tolerate the School District instructing a journalist that she could not make voice recordings or even handwritten notes concerning the documents she was reviewing. But the media does not enjoy First Amendment rights greater than the average citizen. *Branzburg v. Hayes*, 408 U.S. 665, 684 (2001). Still, Auslander's right to audio record his thoughts on the PEG documents is only the floor that the First Amendment creates.

The First Amendment also protects Auslander's right to make a record of what the documents say, including copying the documents. *Nixon*, 435 U.S. at 597.Indeed, the First Amendment protects not just the right of a citizen to witness police action but to record it. *Fields*, 862 F.3d at 359; *Robinson*, 378 F.Supp.2d at 541. It protects not just the right of the public to attend bail hearings but to audio record those hearings in a peaceful manner. *Philadelphia Bail Fund,* 440 F.Supp.3d at 425-26.If the public has the right to video record police activity and audio record bail hearings, certainly it has the right to make copies of documents created for the School District using taxpayer money and widely used by the School District in teaching and training students, teachers, and staff.

Permitting Auslander to copy the PEG materials fosters the "free flow of information to the people concerning public officials, their servants." *Garrison,* 379 U.S. at 77.  There is little doubt that robust debate regarding the School District's relationship with PEG and the materials produced by PEG to teach and train teachers and students is important. On one hand, the public deserves to know what their taxes are paying for and whether what is paid for is worth it. On the other hand,

parents have a right to know what their children are taught and how their teachers are trained and to openly debate whether School District officials made the right decision to teach it.[3] The best way for the public to make that determination is to have copies of the PEG materials so they can be easily shared, objectively reviewed, and discussed. *Fields,* 862 F.3d at 359. That cannot be accomplished if the documents can only be reviewed without transcription one person at a time. If the public is not permitted to transcribe, *in any way*, what the PEG Materials say and is only permitted to view the materials one person at a time, the free flow of information becomes a trickle. Also, an in-person review of the PEG Materials done on a per person basis and only upon request hardly "ensures that this constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper Co. v. Superior Court of Norfolk County,* 457 U.S. 596, 605 (1982). The School District is not promoting an informative discussion of governmental affairs. Instead, it is promoting one based on innuendo and secondhand account of what a neighbor saw, or, worse, what the government says the documents contain. Without a record of what the PEG Materials say and how they are being used, public scrutiny of the School District's decision to affiliate with PEG is obstructed and "the principle that debate on public issues should be uninhibited, robust, and wide-open" curtailed. *New York Times,* 376 U.S. at 270.  Therefore, the School District's policy is designed to stymie

---

[3] The School District is obligated to provide parents with access to the PEG materials under federal and state statutes.  See 20 U.S.C. § 1232h(a) ("All instructional materials, including teacher's manuals, films, tapes, or other supplementary material which will be used in connection with any survey, analysis, or evaluation as part of any applicable program shall be available for inspection by the parents or guardians of the children."); 20 Pa.Code § 4.4(d).

the free flow of information not to encourage it. In sum, the School District's policy of preventing voice recordings of impressions concerning the PEG documents and the refusal to permit copying of PEG Materials violate the First Amendment and the principals undergirding it.

It is hardly speculation as to why the School District does not want the PEG Materials disclosed: they are controversial and will subject School District officials' to public criticism. The School District will likely suggest that the request for the PEG Materials is politically driven by the agenda of plaintiff's co-counsel, America First Legal ("AFL") and the criticism it my engender.[4] That comes with the territory. Debate on public issues "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270. But it is never a valid reason to stop, slow, or tapper down the debate. The public's right to criticize government officials, even harshly, is at the heart of the First Amendment. The School District's unyielding attempts to shield the PEG Materials from public view only strengthens the First Amendment argument for their disclosure.

The First Amendment requires that the public be afforded some means of compiling a comprehensive record of the PEG Materials such as through audio recording, note taking, copying, or creating a stenographic record, especially where the School District currently affords none. *Whiteland Woods, LP v. Twp. of West*

---

[4] In fact, the School District worries about AFL's access to the PEG materials insisting that only one attorney from AFL be permitted to view one hard copy of the materials. *See* Confidentiality Stipulation and Order.

*Whiteland*, 193 F.3d 177 (3d Cir. 1999); see also, *Philadelphia Bail Fund,* 440 F.Supp.3d. at 423 ("The precedents in this circuit have emphasized how important the objective record of an event can be beyond what one may see or hear.") Here, the School District allows no record to be taken of the PEG documents because it broadly prohibits any transcription, or even note taking, of the PEG documents. The prohibition cuts broadly enough to include preventing Auslander from recording his impressions of PEG Materials. This cannot withstand First Amendment scrutiny.

The First Amendment requires the School District to provide Auslander with access to the PEG Materials, permits him to record himself expressing his thoughts on the PEG Materials, and to make copies of the PEG Materials. Accordingly, the Court should issue an appropriate order prohibiting the School District from violating Auslander's First Amendment rights.

## II.     THE SCHOOL DISTRICT LACKS A COMPELLING STATE INTEREST TO SHIELD THE TRAINING MATERIAL FROM PUBLIC VIEW AND CRITICISM.

Of course, Auslander's First Amendment right is not absolute. However, the School District's actions are subjected to strict scrutiny such that they must be narrowly tailored and be necessitated by a compelling governmental interest. *Philadelphia Bail Fund*, 440 F.Supp.3d at 420. The School District presses two arguments to justify Auslander's inability to transcribe, *in any form* (including recording his thoughts), the PEG materials. First, the School District argues that to permit Auslander to transcribe in any manner, including recording his mental impressions, violates the Copyright Act of 1976, 17 U.S.C. § 101, et. seq. (the "Copyright Act") Second, the School District argues that it is required to keep the

PEG documents confidential under its 2021 agreement with PEG.  Neither of those arguments have merit.

### A. THE COPYRIGHT ACT.

The School District concedes that it does not claim a copyright in the PEG Materials. But, the School District has consistently maintained that the Copyright Act allows it to prohibit transcription of the PEG documents in any form, including preventing Auslander to audio record his thoughts on the PEG documents. That is the position that School District took in response to Auslander's Right to Know request. Exhibit 18. It is also the position that McDonnell took at the February 7, 2022 meeting whereby he repeatedly told Auslander that his conduct violated the Copyright Act. Exhibit 20-9.

First and foremost, whatever application the Copyright Act has to the PEG Materials (it has none), it is beyond peradventure that the Copyright Act justifies the School District preventing Auslander from verbally recording his thoughts on what the PEG documents say. *New York Times Co. v. United States*, 403 U.S. 713, 726, n*, (1971)(Brennan, J. concurring) ("copyright laws, of course, protect only the form of expression and not the ideas expressed.") The School District's belief that any "transcription" of a copyrighted work is a violation of the Copyright Act, including recorded audio of mental impressions, is misplaced. The Act does not cut so broadly. Rather, the Copyright Act prohibits reproduction of a copyrighted work in conflict with the Copyright Act. So, for example, you do not violate the Copyright Act by singing your favorite song in the shower. *Twentieth Century Music Corp. v. Aiken*,

14

422 U.S. 151, 155 (1975). Otherwise, the Copyright Act could curtail any recorded criticism of a copyrighted work. Therefore, the Copyright Act in no way justifies the School District's prohibition on Auslander's recording of voice notes concerning the PEG materials.

The fair use doctrine also shields Auslander from any copyright liability. The Copyright Act expressly states "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C.A. § 107. "The fair use [doctrine] affords considerable "latitude for scholarship and comment and even for parody." *Eldred v. Ashcroft*, 537 U.S. 186, 220 (2003). Therefore, Auslander's reproduction of the PEG materials, by any means, falls squarely within the fair use doctrine and the School District's copyright argument is unavailing.

The other problem with the School District's Copyright Act defense is that it admittedly does not claim a copyright in the PEG Materials. Therefore, it is not the owner of the copyright and lacks standing to assert a copyright claim. 17 U.S.C.A. § 101 ("Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.") The Copyright Act protects the holder's ownership rights in the copyright. That is, PEG and not the School District, would be the holder of any copyright. 17 U.S.C.A. § 106. And the act allows PEG, not the School District, to bring an action against a person who allegedly

infringes on its copyright in the work. 17 U.S.C.A § 501 ("the legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.") So, while PEG might have a claim to assert against Auslander under the copyright act, the School District does not.

The School District's Copyright Act argument is disingenuous at best. Accordingly, the Court should reject it.

## B. THE PROFESSIONAL SERVICES AGREEMENT WITH PEG.

While consistently relying on the Copyright Act as justification to shield the PEG Materials from transcription in any form—possibly realizing the futility of this argument—the School District shifts its argument. Now, the School District claims that transcription is prohibited because of a confidentiality provisions in the 2021 Agreement with PEG. This is pretextual. The School District has never previously taken this position. Indeed, its conduct in allowing Auslander to see the documents beguiles the assertion that the documents are confidential. Moreover, whatever confidentiality obligations the 2021 agreement imposes on the School District, those obligations do not provide the School District with a justification for stopping Auslander from recording his thoughts about the PEG documents. Auslander recording his thoughts on the documents in real time is no more adverse to the School District's confidentiality obligation (whatever they are) than if Auslander recorded his thoughts immediately after his review concluded and he left the School District building.

16

The School District also cannot use a confidentiality agreement to defeat a strong First Amendment interest in reviewing, copying, and disclosing the PEG Materials. Courts have long held that confidentiality agreements do not supersede the First Amendment right of access to documents. *Leocadia, Inc. v. Applied Extrusion Technologies, Inc.,* 998 F.2d 157 (3d Cir. 1993) (confidentiality agreement did not defeat right to obtain documents filed in litigation pursuant to the agreement and under seal.); *Tribune-Review Pub. Co. v. Westmoreland Cty. Hous. Auth.*, 833 A.2d 112, 117 (Pa. 2003) (settlement agreement involving public agency is public document notwithstanding confidentiality clause in the agreement.); *Cogen, Sklar & Levick v. Com.*, 814 A.2d 825, 828 (Pa.Cmwlth. 2003) ("private parties cannot contract away the public's right to access public records."); *Morning Call, Inc v. Hous. Auth. of City of Allentown*, 769 A.2d 1246, 1249 (Pa.Cmwlth. 2001) (settlement agreement was public record subject to disclosure notwithstanding confidentiality clause.)

It stands to reason that confidentiality agreements are weakest when, like here, those that will benefit from them are public officials. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 788 (3d Cir. 1994). If "a major purpose of the [First] Amendment [is] to protect the free discussion of governmental affairs" and "to ensure …discussion of government affairs' is an informed one," it must not be defeated by a confidentiality clause. *Philadelphia Bail Fund*, 440 F.Supp.3d at 420 (quoting *Globe Newspaper Co.*, 457 U.S. at 604-605) Otherwise, a government agency could always shield unpopular documents from public criticism, publication, and discussion simply by making them subject to a confidentiality agreement with the publisher. Whole

classes of documents could be shielded from public view and criticism, the First Amendment right of access thwarted, and the common law right to make copies of public records ended. For example, the judiciary could shield court transcripts from public review and copying by entering into an agreement with the court reporter to keep the transcripts confidential. Likewise, a local agency could prevent the public from obtaining copies of government contracts by included language in the contract that stated the contract would be kept confidential. The law does not permit that.

The confidentiality clause also allows the School District to place an unconstitutional condition on the public right of access.  Under the unconstitutional conditions doctrine, the government may not condition a benefit on refraining from exercising a constitutional right. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604, (2013) (citations omitted). The doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id*. Here, the School District is using the confidentiality clause as a means to place conditions on the public's right to access, copy, and speak about the PEG Materials. In essence, the School District permits the public to see the PEG Materials conditioned on the public agreeing not to transcribe them, thereby preventing them from sharing the PEG Materials with fellow citizens to subject them to criticism.

In all events, the documents are not confidential or proprietary under Pennsylvania law anyway. Pennsylvania law defines "confidential proprietary information" as "(1) which is privileged or confidential; and (2) the disclosure of which would cause substantial harm to the competitive position of the person that

18

submitted the information." 65 P.S. § 67.102. The party in the best position to argue the confidential and proprietary nature of the PEG Materials is PEG, not the School District. The School District repeatedly asked PEG for its position on the confidential nature of the PEG materials, including a request that it provide a written statement. But, despite the School District practically begging PEG for a written statement PEG apparently never gave it one. If the School District had obtained that statement from PEG, it would have argued the materials were copyrighted and confidential. Not surprisingly, PEG has not moved to intervene in this case to protect the supposed confidential and proprietary nature of the PEG Materials nor did it seek to intervene in any of the Right to Know appeals at the state level. PEG undoubtedly knows that members of the public have requested copies of its materials and apparently is unconcerned. Conversely, the School District will not be harmed at all.

Furthermore, Pennsylvania law requires a showing that the School District undertook efforts to maintain the secrecy of the PEG documents and a likelihood of substantial competitive injury if the information were released. *Crouthamel v. Dep't of Transp.*, 207 A.3d 432, 441 (Pa.Cmwlth. 2019) "Competitive harm analysis is limited to harm flowing from the affirmative use of proprietary information by competitors." *Id.* The PEG materials do not meet this definition because, except for in this litigation, the School District never undertook efforts to maintain the secrecy of the documents. For starters, while shielded from public scrutiny, the PEG materials are not secret. The School District allowed Auslander to review them and shows them to hundreds of teachers and students. As of 2020, the School District had

already used the PEG materials to instruct at least 150 members of the faculty. Ex. 3, at p. 4, 9. And as of 2020, at least 50 students were required to undergo anti-racism training using the documents. *Id.*

There is no substantial likelihood that Auslander will use the materials to compete with PEG. Auslander wants to use the materials to criticize PEG and the School District officials regarding, among other things, the School District's relationship with PEG, its use of taxpayer money to pay PEG, and the materials that the School District is using to teach students and faculty. Therefore, there is no indicia of secrecy or confidentiality attached to the PEG documents. *See e.g., Nolen v. Philadelphia Dist. Atty's Office*, OOR Dkt. AP 2016-1187 (holding that a training manual created by a third party used to train new employees was not confidential information exempt from disclosure.)

The Court has the PEG Materials and can also plainly see that they contain no financial information or personal data. Yet, the School District treats the PEG Materials as if they are the Pentagon Papers, except the New York Times was permitted to publish those. *New York Times v. United States*, 403 U.S. 713 (1971).

Finally, putting those arguments aside, the text of the School District's 2021 agreement does not shield *all* material from disclosure *without exception*. The confidentiality clause recognizes that the School District is obligated to comply with all laws and regulations to it.  Ex. 1, ¶ 6. Yet, the confidentiality clause recognizes that the School District's confidentiality obligations must yield to its legal obligations. It states that the School District "shall only . . . disclose such confidential information

as is strictly necessary for [the School District's] performance of its obligations." *Id.*
Here, those legal obligations include the First Amendment and Pennsylvania's Right
to Know Law.  The Court should also narrowly interpret that clause because of First
Amendment concerns.

Accordingly, the Court should reject the School District's argument that the
confidentiality clause in its agreement with PEG provides it with a compelling
governmental interest.

### III.   ABSOLUTE AND QUALIFIED IMMUNITY DO NOT APPLY TO CLAIMS FOR EQUITABLE RELIEF TO REMEDY CONSTITUTIONAL VIOLATIONS.

The School District has also claimed that it enjoys absolute or qualified
immunity to Auslander's claims. This is not the law. While absolute and qualified
immunity might shield the School District and McDonnell from monetary damages,
it is well-settled that those immunities do not apply to Auslander's claims for
injunctive relief.  As the Third Circuit explains, "the policy rationale for granting
qualified immunity is that, we do not want officials to make discretionary decisions
with one wary eye on their pocketbook." *Acierno v. Cloutier*, 40 F.3d 597, 608 (3d Cir.
1994). It protects state officials from liability for civil monetary damages. *Pearson v.
Callahan*, 555 U.S. 223, 231 (2009) But "the defense is not available … [] in § 1983
cases against individuals where injunctive relief is sought instead of or in addition to
damages." *Id.* at 243-244; *See also*, *Acierno*, 40 F.3d at 608 (holding qualified
immunity "does not apply to suits for injunctive relief."); *Urrutia v. Harrisburg Cty.
Police Dep't*, 91 F.3d 451, 462 (3d Cir. 1996); *N.N. v. Tunkhannock Area Sch. Dist.*,

801 F.Supp.2d 312, 317 (M.D. Pa. 2011) ("both absolute prosecutorial immunity and qualified immunity only apply when monetary damages are sought; these doctrines are inapplicable when equitable or injunctive remedies are at issue.")

Defendants have also claimed that absolute and qualified immunity apply to the claims, not the relief. Therefore, they claim they are still immune from suit although Auslander seeks injunctive relief. This is clearly not the law and absolute and qualified immunity do not defeat Auslander's claims.

## CONCLUSION

Based on the foregoing and the evidence to be submitted at trial, plaintiff respectfully requests that the Court enter judgment and an injunction against the School District and McDonnell prohibiting them from continuing to interfere with Auslander's First Amendment right to review the PEG Materials, make voice recording of his mental impressions of those materials, and to make copies of the PEG Materials. He also requests an awarding of attorneys' fees and costs on application to the Court

Respectfully submitted,

Dated:  May 9, 2022

*/s/ Walter S. Zimolong*
WALTER S. ZIMOLONG III, ESQUIRE
Zimolong, LLC
Attorney I.D. 89151
wally@zimolonglaw.com
PO Box 552
Villanova, PA 19085-0552
Tele: 215-665-0842

*/s/ Nicholas R. Barry*
America First Legal Foundation
Tennessee Bar No. 031963
nicholas.barry@aflegal.org
611 Pennsylvania Ave SE #231
Washington, DC 20003
(admitted *pro hac vice*)

## CERTIFICATE OF SERVICE

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Eastern District of Pennsylvania.  I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Date:  May 9, 2022                                    */s/ Walter S. Zimolong, Esquire*