## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENJAMIN AUSLANDER, | : No: 2:22-cv-01425-HB |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| TREDYFFRIN/EASTTOWN SCHOOL | : |
| DISTRICT, et. al, | : |
| | : |
| Defendants. | : |

## ORDER

**AND NOW**, this _____ day of _____ 2022, upon consideration of the motion for summary judgment of the plaintiff, Benjamin Auslander, and any response in opposition thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff is awarded nominal damages, attorneys fees, and costs under 42 U.S.C. § 1988. Plaintiff shall submit a petition in support of its requests for attorneys fees and costs.

BY THE COURT:

_____

THE HONORABLE HARVEY BARTLE III

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BENJAMIN AUSLANDER, | : | No: 2:22-cv-01425-HB |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| TREDYFFRIN/EASTTOWN SCHOOL | : | |
| DISTRICT, et. al, | : | |
| | : | |
| Defendants. | : | |

## MOTION FOR SUMMARY JUDGMENT

Plaintiff respectfully moves for summary judgment. There are no genuine issues of material fact and the plaintiff is entitled to judgment as a matter of law. The accompanying brief presents our arguments and authorities.

Respectfully submitted,

*/s/ Walter S. Zimolong, Esq.*
Walter S. Zimolong, Esquire
Zimolong, LLC
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
wally@zimolonglaw.com

*/s/ Nicholas R. Barry*
America First Legal Foundation
Tennessee Bar No. 031963
nicholas.barry@aflegal.org
611 Pennsylvania Ave SE #231
Washington, DC 20003
(admitted *pro hac vice*)

*Attorneys for Plaintiffs*

Dated:  October 31, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BENJAMIN AUSLANDER, | : | No: 2:22-cv-01425-HB |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| TREDYFFRIN/EASTTOWN SCHOOL | : | |
| DISTRICT, et. al, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The First Amendment anchors "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The teaching of critical race theory[1] in our nation's schools has engendered a contentious national debate. Gabriella Borter, Explainer: *What 'critical race theory' means and why it's igniting*

---

[1] Two leading proponents of CRT, Richard Delgado and Jean Stefanic, state "critical race theory questions the very foundations of the liberal order, legal reasoning, enlightenment rationalism, and neutral principals of constitutional law." RICHARD DELGADO & JEAN STEFANIC, CRITICAL RACE THEORY: AN INTRODUCTION, 3, (NEW YORK UNIVERSITY PRESS EDS., THIRD EDITION, 2017) CRT theorist believe "racism is ordinary, not aberrational – "normal science," the usual way society does business, the common, everyday experience of most people of color in this county." *Id.*, 8. "Critical race theorists (or "crits" as they are sometimes called) hold that color blindness will allow us to redress only extremely egregious racial harms, one that everyone would notice and condemn [and] only aggressive, color-conscious efforts to change the way things are will do much to ameliorate misery." *Id.*, at 27. Therefore, they advocate against those in the judiciary that exercise color blindness when applying the law. *Id.*, 28.  CRT advocates are also "suspicious of another liberal mainstay, namely, rights." *Id.*

*debate*, reuters.com (Sept. 22, 2021); Joshua Jamerson, *Critical Race Theory: What it Means for America and Why It Has Sparked Debate*, Wall Street Journal, June 17, 2021. This case is about plaintiff's efforts to express his views on CRT and to obtain copies of CRT materials purchased with taxpayer money to use and distribute to further a robust and free debate on the topic. When plaintiff requested copies of those materials, he was permitted to inspect but not reproduce the documents. When he attempted to speak about the documents, defendants demanded he stay quiet, told him he was violating the copyright act, and terminated his inspection. Defendants' conduct violated the first amendment. Plaintiff now moves for summary judgment in his favor and asks this Court to enter declaratory, injunctive, and monetary relief.

## Background

Since 2018, the School District has maintained a contract with a third-party vendor, Pacific Educational Group, for the preparation of materials related to the School District's CRT program. www.tesd.net/Page/16577. Joint Stipulation of Facts ("Stip"), ¶ 5, 10.[2] The School District uses taxpayer money to pay for PEG's services. *Id.*, ¶ 9. The School District identifies PEG work on the School District's website. www.tesd.net/Page/16577. *Id.*, 10. The School District has identified six components of PEG work for the School District:

- Beyond Diversity
- District Executive Equity Leadership Team (DELT)
- Leadership for Racial Equity Team (LEADS)
- Site Equity Leadership Teams (E-Teams)
- PEG Affiliate Practitioners
- Students Organized for Anti-Racism (SOAR)

---

[2] The Joint Stipulation of Facts is document ECF No. 16.

*Id.*, Exhibit 2.[3]

The specifics of these components are explained in the document *TESD and Pacific Educational Group, An Update on Racial Equity Work Provided by the Education Committee, April 2020. Id.*, ¶ 11, Exhibit 3.[4] As stated in that document, "DELT is focused on building executive capacity and accountability for leading and implementing district equity transformation." *Id.*, Ex. 3, p. 5. "LEADS is focused on deepening the will, skill, knowledge and capacity of administrators to lead, oversee, and manage the dynamic process of system-wide racial equity transformation." *Id.*, p. 6. The participants in LEADS are superintendents, directors, principals, and assistant principals. *Id.* "E-Teams examine their school's policies, practices, programs, structures, climate and culture to identify barriers to equity and excellence and lead systemic change efforts that result in high levels of achievement for all students." *Id.*, p. 7. It explains that the PEG Affiliate Program "is designed to enable participants to serve as Courageous Conversations About Race Practitioners, Facilitators, and Coaches within their own school districts." *Id.*, p. 8. Finally, the School District explains that SOAR is directed towards students in the School District and "is designed to empower young people of all races to become catalysts for change through leadership and racial equity." *Id.*, p. 9. "Students receive training in Beyond Diversity that is similar to what is provided to adults." *Id.* Teachers, counselors and administrators "recommend" students that need this training. *Id.* Additionally, PEG

---

[3] ECF 16-2.
[4] ECF 16-3.

reviews the School District's ELA and social studies curriculum "through the lens of equity and social justice." *Id.*, p. 10.

Plaintiff Auslander is a parent of a student in the School District and resident of Chester County. Stip., ¶ 1. Auslander is someone who regularly attends school board meetings and who has spoken publicly several times at those meetings. Deposition of Arthur J. McDonnell ("McDonnell dep.), 31:18-23. When he spoke, Auslander would often speak about the teaching of critical race theory (CRT) in the school district. *Id.*, 32:7-12.

On January 19, 2022, Auslander made a request to the School District under Right to Know Law for documents related to the teaching of CRT. Stip., ¶ 27. Specifically, he requested for "all records, lesson plans, and materials prepared by PEG to [the School District's] teachers." Stip., ¶ 27, Exhibit 18.[5]  That request went to defendant McDonnell. McDonnell dep., 31:1-11. Defendant McDonnell is the School District's business manager and open records officer. Stip., ¶¶ 2,3; McDonnell dep., 14:12-18. He is also the secretary of the Board of Education. *Id.*, 11:18-21 When McDonnell received the request, the School District's superintendent directed him to discuss the request with the School Board specifically because of the content of the request. He testified ""we thought updating the board made sense 'cause it was connected to what he was talking about at meetings which was CRT." *Id.*, 34:21:25, 35:1-5.

---

[5] Exhibit 18 appears at ECF No. 17.

On January 26, 2022, McDonnell, on behalf of the School District, issued a written denial of Auslander's right to know request. *Id.*, ¶ 28 and Exhibit 19.[6]  The reason McDonnell gave for denying Auslander's right to know request was:

> "The request for copies of the records is denied because they are protected by copyright, however, you may contact my office to schedule a time to inspect the responsive records. Please note that due to copyright protections, you will not be permitted to copy or photograph the records."

Exhibit 19.

The School District does not claim to hold a copyright in any materials produced or created by PEG. Stip., ¶ 30. But the School District does claim that PEG holds a copyright. *Id.* Nonetheless, the School District permitted Auslander an on-site inspection of the documents. The only other instance that McDonnell could recall whereby a requester was denied copies of document but provided an opportunity to inspect them was regarding a similar right to know request concerning the PEG materials. McDonnell dep., 42:13-25, 43:1-10, 44:5-7.

Pursuant to the School District's offer to inspect the responsive records, on February 7, 2022, at 1:30 p.m., Mr. Auslander went to the School District's offices located at 940 West Valley Road, Suite 1700, Wayne, PA 19087, to inspect the records. *Id.*, ¶ 31.  The School District made available to Auslander 166 pages of documents prepared for the School District by PEG (the "PEG Materials"). *Id.*, ¶¶ 12, 31, 35. McDonnell was present at the inspection, as was Mary Minicozzi, an employee of the School District. *Id.*, ¶ 4. During his review of the PEG Materials, Auslander made

---

[6] Exhibit 19 appears at ECF No. 16-18.

verbal recordings on his smartphone.  *Id.*, ¶ 36. Auslander made a total of 11 voice recordings. *See* Exhibits 20-1 through 20-11.[7]  McDonnell told Auslander that he could not make voice recordings. Stip., ¶ 37, Exhibits 20-1 through 20-11. McDonnell said that Auslander's voice memorandum were considered transcribing and "that is a violation of the copyright law."  Ex. 20-8, 20-9.  McDonnell told Auslander "you recording what's in writing there into your phone is a violation of the copyright law." Ex. 20-9. McDonnell then said, "what is going to happen is when you leave I am going to inform PEG and inform their (sic) attorney. . . and I am advising you it is a violation of the copyright law."  *Id.* McDonnell told Auslander that "if [he] did one more voice recording, he would end the meeting" after which McDonnell collected the materials and asked Auslander to leave. Ex. 20-11. At 2:00 p.m. McDonnell ended Auslander's review of the documents. Stip., ¶ 40. McDonnell made those comments after discussions with his counsel, Wilser Pearlstein, LLP. *Id.*, ¶ 41. McDonnell had authority to make those comments on behalf of the School District. *Id.*, ¶ 42. McDonnell had final authority to terminate the inspection and did decide to terminate the inspection because Auslander was making voice recordings while inspecting the PEG Materials. *Id.*, ¶¶ 42-43.

---

[7] Exhibits 20-1 through 20-11 were sent to the Court electronically on a thumb drive on May 12, 2022.

ARGUMENT

I.   THE FIRST AMENDMENT PROTECTS THE RIGHT TO CRITICIZE GOVERNMENT
     CONDUCT AND TO GATHER INFORMATION TO FACILITATE THAT CRITICISM
     THROUGH VIDEO AND AUDIO RECORDINGS.

Auslander has a first amendment right to audio and video record public documents made available for inspection to him. Defendants' prohibition on Auslander's right to video and audio record the PEG materials violates his first amendment rights. The School District has never admitted wrongdoing and has not affirmatively stated that it would cease similar offending conduct in the future which entitles Auslander to equitable relief. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") Moreover, Auslander is entitled to nominal damages to vindicate his first amendment rights. *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000) ("the Supreme Court recognized in both *Carey* and *Stachura* that certain absolute constitutional rights may be vindicated by an award of nominal damages in the absence of any showing of injury warranting compensatory damages."

A pillar of the First Amendment is the protection of public debate on issues of public concern and of the officials in a position to address those issues and concerns. *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues."). In *Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 604 (1982), the Supreme Court recognized the paramount importance of a robust debate on the

conduct of government officials explaining, "a major purpose of the [First] Amendment was to protect the free discussion of governmental affairs" and "to ensure that this constitutionally protected 'discussion of government affairs' is an informed one." It follows that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt,* 383 U.S. at 85. And "[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Id.* Therefore, the Supreme Court recognizes "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, (1964). Accordingly, public discourse on public issues is afforded "the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Synder v. Phelps,* 562 U.S. 443, 452 (2011); *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) (recognizing the "paramount public interest in a free flow of information to the people concerning public officials, their servants.")

For that criticism to be effective, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–76 (1980). The First Amendment incorporates a general right, rooted in common law predating the Constitution, to gather information about official conduct including a "right of access to information about [] officials' public activities." *Fields v. City of Philadelphia*, 862

F.3d 353, 359 (3d Cir. 2017).[8]  Thus, there is a First Amendment right, "to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).

The Third Circuit recognizes that the right to gather information includes the right to record government conduct using video or audio recordings. In *Fields*, the Third Circuit articulated the important role audio and video recording play in facilitating the uninhibited robust and wide-open exchange of information:

> "To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts. Hence to record is to see and hear more accurately. Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media."

*Fields,* 862 F.3d at 359.

In *Fields*, that meant the public had the right to video record police activity. In *U.S. v. Criden*, that meant news organizations could make copies of exhibits admitted into evidence in a criminal trial, including video and audio tapes. 648 F.2d 814 (3d. Cir. 1981). In *Robinson v. Fetterman*, 378 F.Supp.2d 534, 541 (E.D. Pa. 2005), it meant that the First Amendment protected video recording of police activity because "videotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence, as it did in this case." And in *Philadelphia Bail Fund v. Arraignment Court Magistrate Judges*, 440 F.Supp.3d 415

---

[8] Through its Right to Know Law, 65 P.S. § 67.101, et. seq., under which Auslander made his request, Pennsylvania also recognizes the importance of public criticism of government officials and the Pennsylvania Supreme Court has declared that the law is "designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *McKelvey v. Pennsylvania Dep't of Health*, 255 A.3d 385, 400 (Pa. 2021).

(E.D. Pa. 2020) it meant that the First Amendment provided a right to audio record bail proceedings in Philadelphia Municipal Court even though the Pennsylvania Rules of Criminal Procedure and the Pennsylvania Rules of Judicial Administration prohibited such audio recordings. The common thread of these cases is that First Amendment protects the public's right to witness the conduct of government officials *and* the right to record it in a manner that will facilitate wide dissemination and discussion among the public. The School District and McDonnell's policies and conduct are inconsistent with this jurisprudence.

To be clear, the School District denied Auslander both his expressive conduct and his right of access. The School District denied Auslander's right to engage in expressive conduct when it stopped Auslander from recording on his phone the thoughts he expressed about the documents. He was not taking photographs of the documents, nor did he attempt to. There should be no question that the First Amendment clearly protects Auslander's right to—at a minimum—record his own thoughts. The School District violated his First Amendment rights by claiming his expressive activity violated the "Copyright Act" and by terminating his review of the documents if he continued to engage in expressive conduct. Indeed, by changing one variable, the School District's argument becomes patently absurd. Suppose Auslander was a journalist instead of an average citizen.  This Court would hardly tolerate the School District instructing a journalist that she could not make voice recordings or even handwritten notes concerning the documents she was reviewing. But the media does not enjoy First Amendment rights greater than the average

citizen. *Branzburg v. Hayes*, 408 U.S. 665, 684 (2001). Still, Auslander's right to audio record his thoughts on the PEG documents is only the floor that the First Amendment creates.

The First Amendment also protects Auslander's right to make a record of what the documents say, including copying the documents. *Nixon,* 435 U.S. at 597. Indeed, the First Amendment protects not just the right of a citizen to witness police action but to record it. *Fields*, 862 F.3d at 359; *Robinson*, 378 F.Supp.2d at 541. It protects not just the right of the public to attend bail hearings but to audio record those hearings in a peaceful manner. *Philadelphia Bail Fund,* 440 F.Supp.3d at 425-26. If the public has the right to video record police activity and audio record bail hearings, certainly it has the right to make copies of documents created for the School District using taxpayer money and widely used by the School District in teaching and training students, teachers, and staff.

Permitting Auslander to copy the PEG materials fosters the "free flow of information to the people concerning public officials, their servants." *Garrison,* 379 U.S. at 77.  There is little doubt that robust debate regarding the School District's relationship with PEG and the materials produced by PEG to teach and train teachers and students is important. On one hand, the public deserves to know what their taxes are paying for and whether what is paid for is worth it. On the other hand, parents have a right to know what their children are taught and how their teachers are trained and to openly debate whether School District officials made the right

14

decision to teach it.[9] The best way for the public to make that determination is to have copies of the PEG materials so they can be easily shared, objectively reviewed, and discussed. *Fields,* 862 F.3d at 359. That cannot be accomplished if the documents can only be reviewed without transcription one person at a time. If the public is not permitted to transcribe, *in any way*, what the PEG Materials say and is only permitted to view the materials one person at a time, the free flow of information becomes a trickle. Also, an in-person review of the PEG Materials done on a per person basis and only upon request hardly "ensures that this constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper Co. v. Superior Court of Norfolk County,* 457 U.S. 596, 605 (1982). The School District is not promoting an informative discussion of governmental affairs. Instead, it is attempting to stifle criticism of itself through promotion of innuendo and only allowing a secondhand account of what a neighbor saw, or, worse, what the government says the documents contain. Without a record of what the PEG Materials say and how they are being used, public scrutiny of the School District's decision to affiliate with PEG is obstructed and "the principle that debate on public issues should be uninhibited, robust, and wide-open" curtailed. *New York Times,* 376 U.S. at 270. Therefore, the School District's policy is designed to stymie the free flow of information not to encourage it. In sum, the School District's policy of preventing

---

[9] The School District is obligated to provide parents with access to the PEG materials under federal and state statutes.  See 20 U.S.C. § 1232h(a) ("All instructional materials, including teacher's manuals, films, tapes, or other supplementary material which will be used in connection with any survey, analysis, or evaluation as part of any applicable program shall be available for inspection by the parents or guardians of the children."); 20 Pa.Code § 4.4(d).

voice recordings of impressions concerning the PEG documents and the refusal to permit copying of PEG Materials violate the First Amendment and the principals undergirding it.

It is hardly speculation as to why the School District does not want the PEG Materials disclosed: they are controversial and would subject School District officials to public criticism.  McDonnell did not process the request in the normal course. Rather, he singled out Auslander's request expressly because it requested documents that would subject the Board to criticism. Before responding to the request, at the direction of the School District's superintendent, McDonnell discussed it with the School Board because it related to CRT and Auslander's criticism of CRT at School Board meeting.  But criticism comes with the territory.  Debate on public issues "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270. But it is never a valid reason to stop, slow, or tapper down the debate. The public's right to criticize government officials, even harshly, is at the heart of the First Amendment.

The School District's unyielding attempts to shield the PEG Materials from public view only strengthens the First Amendment argument for their disclosure. But for this lawsuit, the public might have never known what the PEG Materials said. And, but for this lawsuit, the public would be limited in criticizing the School District and its officials about what the PEG materials say.

The First Amendment requires that the public be afforded some means of compiling a comprehensive record of the PEG Materials such as through audio

recording, note taking, copying, or creating a stenographic record, especially where the School District currently affords none. *Whiteland Woods, LP v. Twp. of West Whiteland*, 193 F.3d 177 (3d Cir. 1999); see also, *Philadelphia Bail Fund*, 440 F.Supp.3d. at 423 ("The precedents in this circuit have emphasized how important the objective record of an event can be beyond what one may see or hear.") Here, the School District allowed no record to be taken of the PEG documents because it broadly prohibits any transcription of the PEG documents. The prohibition cuts broadly enough to include preventing Auslander from recording his impressions of PEG Materials. This cannot withstand First Amendment scrutiny.

The First Amendment requires the School District to provide Auslander with access to the PEG Materials, permits him to record himself expressing his thoughts on the PEG Materials, and to make copies of the PEG Materials. Accordingly, the Court should issue an appropriate order prohibiting the School District from violating Auslander's First Amendment rights and awarding him nominal damages.

II.    THE SCHOOL DISTRICT LACKS A COMPELLING STATE INTEREST TO SHIELD THE TRAINING MATERIAL FROM PUBLIC VIEW AND CRITICISM.

Of course, Auslander's First Amendment right is not absolute. However, the School District's actions are subjected to strict scrutiny such that they must be narrowly tailored and be necessitated by a compelling governmental interest. *Philadelphia Bail Fund*, 440 F.Supp.3d at 420. Defendants justify their actions to prohibit Auslander's inability transcribe, *in any form* (including recording his thoughts), because the PEG Materials are allegedly copyright protected. This argument lacks merit.

The School District concedes that it does not claim a copyright in the PEG Materials. But the School District has consistently maintained that the Copyright Act allows it to prohibit transcription of the PEG documents in any form, including preventing Auslander to audio record his thoughts on the PEG documents. That is the position that School District took in response to Auslander's Right to Know request. Exhibit 18. It is also the position that McDonnell took at the February 7, 2022 meeting whereby he repeatedly told Auslander that his conduct violated the Copyright Act. Exhibit 20-9.

First and foremost, whatever application the Copyright Act has to the PEG Materials (it has none), it is beyond peradventure that the Copyright Act justifies the School District preventing Auslander from verbally recording his thoughts on what the PEG documents say. *New York Times Co. v. United States*, 403 U.S. 713, 726, n*, (1971) (Brennan, J. concurring) ("copyright laws, of course, protect only the form of expression and not the ideas expressed.") The School District's belief that any "transcription" of a copyrighted work is a violation of the Copyright Act, including recorded audio of mental impressions, is misplaced. The Act does not cut so broadly. Rather, the Copyright Act prohibits reproduction of a copyrighted work in conflict with the Copyright Act. So, for example, you do not violate the Copyright Act by singing your favorite song in the shower. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 155 (1975). Otherwise, the Copyright Act could curtail any recorded criticism of a copyrighted work. Therefore, the Copyright Act in no way justifies the

School District's prohibition on Auslander's recording of voice notes concerning the PEG materials.

The fair use doctrine also shields Auslander from any copyright liability. The Copyright Act expressly states "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C.A. § 107. "The fair use [doctrine] affords considerable "latitude for scholarship and comment and even for parody." *Eldred v. Ashcroft*, 537 U.S. 186, 220 (2003). Therefore, Auslander's reproduction of the PEG materials, by any means, falls squarely within the fair use doctrine and the School District's copyright argument is unavailing.

The other problem with the School District's Copyright Act defense is that it admittedly does not claim a copyright in the PEG Materials. Therefore, it is not the owner of the copyright and lacks standing to assert a copyright claim. 17 U.S.C.A. § 101 ("Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.")  The Copyright Act protects the holder's ownership rights in the copyright. That is, PEG and not the School District, would be the holder of any copyright. 17 U.S.C.A. § 106. And the act allows PEG, not the School District, to bring an action against a person who allegedly infringes on its copyright in the work. 17 U.S.C.A § 501 ("the legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of

section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.") So, while PEG might have a claim to assert against Auslander under the copyright act, the School District does not.

The School District's Copyright Act argument is disingenuous at best. Accordingly, the Court should reject it.

III.   THE SCHOOL DISTRICT IS RESPONSIBLE FOR MCDONNELL'S ACTIONS.

A government agency, like the School District, is liable for the actions of an official, like McDonnell, when that official possesses final decision-making authority. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019); *Porter v. City of Philadelphia*, 975 F.3d 374, 383 (3d Cir. 2020) ("A pertinent decision by an official with decision-making authority on the subject constitutes official policy.") The School District stipulates that McDonnell had final decision-making authority concerning Auslander's right to know request, his comments directed towards Auslander at the February 7, 2022 inspection, and the termination of that inspection. Stip., ¶ 42. Therefore, the School District is liable for McDonnell's conduct.

## CONCLUSION

Based on the foregoing Auslander respectfully requests that this Court grant him summary judgment.

Respectfully submitted,

Dated:  October 31, 2022

/s/ Walter S. Zimolong
WALTER S. ZIMOLONG III, ESQUIRE
Zimolong, LLC
Attorney I.D. 89151
wally@zimolonglaw.com
PO Box 552
Villanova, PA 19085-0552
Tele: 215-665-0842

/s/ Nicholas R. Barry
America First Legal Foundation
Tennessee Bar No. 031963
nicholas.barry@aflegal.org
611 Pennsylvania Ave SE #231
Washington, DC 20003
(admitted pro hac vice)

## CERTIFICATE OF SERVICE

I hereby certify the foregoing has been filed electronically and is available for viewing and downloading from the Electronic Case Filing System of the United States District Court for the Eastern District of Pennsylvania.  I further hereby certify that, in accordance with Fed. R. Civ. P. 5, service has been made upon counsel of record via ECF.

Date:  October 31, 2022                    */s/ Walter S. Zimolong, Esquire*